See also D.C., 235 F.Supp. 770.

**In the Matter of the SCRANTON CORPORATION**
and
**Hal Roach Studios, Debtors.**

**In the Matter of RABCO TV PRO-DUCTION, INC., Debtor.**

**Nos. 11338, 11402.**

United States District Court
M. D. Pennsylvania.

May 11, 1965.

Nogi, O'Malley & Harris, Scranton, Pa., for debtors.

Paul Bedford, Wilkes-Barre, Pa., Lynne A. Warren, Upper Nyack, N. Y., for movant.

SHERIDAN, Chief Judge.

This is a motion by Hal E. Roach, Sr., a creditor of Hal Roach Studios (Roach Studios), which, together with The Scranton Corporation (Scranton), are debtors in reorganization proceedings under Chapter X of the Bankruptcy Act, for an order requiring the co-trustees for the debtors to produce for inspection a memorandum, prepared by the firm of Morgan, Lewis and Bockius, of Philadelphia, Pennsylvania, special attorneys for the co-trustees.

During 1958 and 1959, F. L. Jacobs Company, Detroit, Michigan (Jacobs), Scranton and Roach Studios came under the domination of Alexander Guterma and associates. Jacobs held the majority of Scranton's outstanding capital stock and Scranton held all of the stock of Roach Studios. Guterma was chairman of the boards of directors of the three concerns. During this time also, Roach Studios wholly owned or had 50 percent stock interests in Rabco TV Productions, Inc. (Rabco), W–R Corporation, Passing Parade Films, Inc. and R. & M. Productions, Inc. The trustees' investigations showed that these companies and others had been involved in numerous intricate financial transactions apparently outside the ordinary course of business. Many of the transactions were not recorded on the books and records of the company and others were unauthorized. The officers of the companies, other than the Guterma group, were unaware of many of the transactions which included joint acquisition of companies, unusual borrowings, and guarantees by one company of the borrowings of another.

In September, 1958, Scranton and Roach Studios purchased all of the capital stock and certain loans receivable of the Mutual Broadcasting System, Inc. (Mutual). Roach Studios furnished the $250,000 down payment. For the balance of the purchase price Roach Studios and Scranton jointly made notes, guaranteed by Jacobs and Guterma as guarantors and Scranton issued 20,000 shares of its common stock. Apparently there is no evidence as to how the ownership of Mutual was to be considered between Scranton and Roach Studios. Six months later Mutual was sold at a substantial loss. By that time Scranton had become guarantor of substantial obligations of Mutual. As a part of the sale consideration the purchaser agreed to furnish Scranton and Roach Studios commercial

announcement time at an approximate value of $1,350,000. Mutual filed a petition for arrangement under Chapter XI of the Bankruptcy Act. Its arrangement called for a payment of 10 percent to general creditors, but after negotiations, it agreed to fully abide by its agreement to furnish Scranton and Roach Studios with the commercial announcement time. Roach Studios had no use for this time and so it was used by Scranton alone. For bookkeeping purposes only the trustees have considered Scranton the owner of Mutual, and the amounts advanced by Roach Studios for the purchase of Mutual have been reflected as advances to Scranton.

Beginning in July, 1958, many unusual bank accounts were opened by Guterma and his associates for Scranton, Roach Studios and Rabco. The accounts were unauthorized. They reflect millions of dollars of receipts and disbursements. Guterma and his associates incurred many loan obligations in the name of Scranton, Roach Studios and Rabco. Many of these were not authorized, and the purported borrowers usually did not receive any benefit from the loans. The proceeds usually were deposited in "unrecorded" bank accounts and can be traced from there to Jacobs and others, to whom those funds had been immediately transferred. The lender in most instances was Reldan Trading Corporation (Reldan), a New York lending agency. Reldan claimed that the various loans to Rabco were guaranteed by Scranton, Roach Studios and Jacobs and the loans to Roach Studios were guaranteed by Scranton. Subsequently, the court approved without objection the settlement of the debtors' claims by and against Reldan and Jacobs without adjusting, however, the debtors' claims against each other.

In 1959, Guterma was convicted of violating federal securities laws and has since pleaded guilty to many other charges. Shortly after Guterma's arrest, Scranton, Roach Studios, Jacobs and Rabco filed petitions for reorganization under Chapter X of the Bankruptcy Act. Proceedings under the Bankruptcy Act have been filed by other firms, not mentioned herein, which were also involved in the unusual transactions. The issues of Mutual's ownership and liability for its debts, and the rights and liabilities of the debtors inter se for the loan guarantees and other unusual transactions will be determined by this court.

Prior to the settlement of the Reldan claims, the trustees, with court approval, engaged the law firm of Morgan, Lewis and Bockius as special counsel to assist the trustees in determining their position in connection with the loans, guarantees and other transactions involving the debtors and Reldan. This firm undertook to become familiar with the complicated factual situations underlying the Reldan claims against Scranton, Roach Studios and Rabco and the trustees' counterclaims. A memorandum was delivered to the trustees on April 24, 1962, for their guidance in deciding on the course of action to be followed. Movant seeks to inspect this memorandum.

The motion, while not denominated as such, will be considered as a motion pursuant to Rule 34 of the Federal Rules of Civil Procedure, which is applicable to proceedings under the Bankruptcy Act. Bankruptcy Act, Sections 102, 21, sub. k, 11 U.S.C.A. §§ 502, 44, sub. k; 6 Collier, Bankruptcy, Para. 7.19 [1] n. 13 at p. 2034 (14th ed.); 2 id. Paragraphs 21.-34, 18.41 [7]. The trustees contend the information sought is irrelevant and immaterial to the determination of the intercompany claims; it represents counsel's "work product" for which good cause has not been shown to justify its discovery; and it is privileged.

The trustees have submitted the memorandum for in camera inspection by the court. The stated purpose of the memorandum was to provide guidance to the trustees in their consideration of the Reldan claims against Scranton, Roach Studios and Rabco. It recites that "The

factual information on which the memorandum is based has been supplied to us by Scranton counsel." One of the counsel for the trustees testified that the memorandum contains facts summarized from records examined primarily in counsel's office in Scranton, Pennsylvania. The memorandum is divided into a section for each loan under which the facts related thereto are set forth, and under a subsection denoted as "comment", legal opinion as to rights and liabilities based on those facts is related. The memorandum concludes, in part:

"In view of the extreme complexity and number of issues involved in this matter, the conclusions reached in this memorandum must be recognized as being purely preliminary and tentative. The facts, as we understand them, necessarily are incomplete at this stage of the proceeding. Furthermore, the legal conclusions reached are not based on exhaustive research because of the number of issues and the various jurisdictions whose laws could be found to be applicable."

 Judge Wyzanski summarized the attorney-client privilege in United States v. United Shoe Machinery Corp., D.Mass.1950, 89 F.Supp. 357:

" * * * The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a)

claimed and (b) not waived by the client."

See also 8 Wigmore, Evidence § 2292 (McNaughton rev. 1961). In holding that the privilege applied to information in defendant's letters to and from law partnerships, Judge Wyzanski said:

" * * * The modern lawyer almost invariably advises his client upon not only what is permissible but also what is desirable. And it is in the public interest that the lawyer should regard himself as more than predicter of legal consequences. His duty to society as well as to his client involves many relevant social, economic, political and philosophical considerations. And the privilege of nondisclosure is not lost merely because relevant nonlegal considerations are expressly stated in a communication which also includes legal advice. It follows that in so far as these letters to or from independent lawyers were prepared to solicit or give an opinion on law or legal services, such parts of them are privileged as contain, or have opinions based on, information furnished by an officer or employee of the defendant in confidence and without the presence of third persons. * * * * "

The memorandum is privileged. The trustees were clients seeking confidential legal advice on information they supplied. There is no indication that the advice was given on facts disclosed by persons other than the trustees or their counsel in Scranton, Pennsylvania. The fact that the trustees' disclosure related in part to the contents of preexisting documents does not affect the assertion of privilege since it does not " * * * make any difference that the client would have been compellable to produce * * * [the documents] * * *, for he is also compellable to tell what he knows on other subjects, and yet his communications about them, made to an attorney, are privileged. The communication of the document is distinct from the docu-

ment itself." 8 Wigmore, Evidence § 2308 (McNaughton rev. 1961). "Where the document already had an independent existence and the communication consists of bringing its contents to *the attorney's knowledge*, that *knowledge* is not to be disclosed by his testimony. \* \* \* But the physical possession of the document is distinct from that knowledge, and to compel production of the document is not to compel disclosure of the communication." Id. § 2307 at page 594. Nor does the fact that the trustees' Scranton counsel supplied the information to Morgan, Lewis and Bockius affect the assertion of the privilege. Id. § 2317. The attorneys' communications to the trustees are also within the privilege. Id. § 2320.

▌ There is no reason why the privilege should not extend to the trustees in a bankruptcy action as well as to suitors in the ordinary adversary action. The policy of the privilege is that "In order to promote freedom of consultation of legal advisers, by clients, the apprehension of compelled disclosure by the legal advisers must be removed. \* \* \*" Id. § 2291, at page 545; Colton v. United States, 2 Cir. 1962, 306 F.2d 633. In the case of In re Ducker, 6 Cir. 1905, 134 F. 43, it was said:

> "The trustee is the hand of the court. He stands as its agent to liquidate the assets, to protect them, and bring them before the court for final distribution. He is not, in fact, more representative of one creditor or claimant than another. The trustee, in the procedure, because he has the legal title to the assets, and is charged with the duty of saving and protecting them, represents the general fund. He is not a purchaser, but as the title of his office imports, he is trustee for all who have interests, and according to those interests. He himself has no interest, and there is nothing in his representation which stands between the court and those who have interests, for the recognition and protection of which they appeal to its authority." [1]

Advice of counsel is necessary to the trustee if he is to carry out his duties to the court and the parties in interest. If their communications are made an open book, the trustee might be less inclined to seek advice before acting and this in turn could work to the detriment of the bankrupt estate and its creditors.

The trustees of Roach Studios are also trustees in reorganization for Scranton, Rabco, and Chemical & Rubber Corporation of America, a wholly owned subsidiary of Scranton. The movant argues that any privilege has been waived by disclosure among the trustees in their quadruple capacities. The movant indicates that to permit withholding of matters developed by court appointed attorneys for the trustees enables a trustee to favor one debtor over another and to judge his own acts. He also filed affidavits in which he points to his many requests for the memorandum and the trustees' refusal to supply it.

▌ In determining whether there has been a waiver of the attorney-client privilege " \* \* \* regard must be had to the double elements that are predicated in every waiver, i. e., not only the element of implied intention, but also the element of fairness and consistency." 8 Wigmore, Evidence § 2327 (McNaughton rev. 1961). There is nothing in the trustees' conduct from which a waiver could be implied. The fact that the same trustees represent several debtors does not constitute a "disclosure" of the information among debtors. The trustees are the clients for purposes of claiming the privilege. Moreover, where consultation was had by "several" clients jointly,

1. The reorganization trustee has all the power of an ordinary trustee, and of a receiver in equity. Central Hanover Bank & Trust Co. v. President and Directors of Manhattan Co., 2 Cir. 1939, 105 F.2d 130.

the waiver should be joint for joint statements, and one could not waive for the disclosure of another's statements. Id. § 2328 at page 639. There is nothing in the affidavits which would indicate an intention to waive the privilege. The information as such in the memorandum has not been even partially disclosed. Moreover, contrary to the movant's assertion, the court, and not the trustees, sits in judgment on the acts of the trustees. The privilege has not been waived.

It is unnecessary to consider the questions of relevance, and work product to which most of the movant's brief has been devoted. An attorney's work product is something separate and apart from the attorney-client privilege. Radiant Burners, Inc. v. American Gas Assoc., 7 Cir.1963, 320 F.2d 314, 323; The Hanover Shoe, Inc. v. United Shoe Machinery Corp., M.D.Pa.1962, 207 F.Supp. 407, 411–412.

The motion will be denied.